United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JOSEPHINE ORTEGA and WENBO YUAN,

Plaintiffs,

v.

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,

Defendant.

Case No.: C 11-04031 PSG

**ORDER GRANTING-IN-PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**(Re: Docket No. 44)**

Plaintiffs Josephine Ortega ("Ortega") and Wenbo Yuan ("Yuan") (collectively, "Plaintiffs") sued the Regents of the University of California ("Regents") for gender and race discrimination under the California Fair Employment and Housing Act ("FEHA") and Title VII of the Civil Rights Act of 1964 ("Title VII"). Before the court is the Regent's motion for summary judgment. Plaintiffs oppose the motion for summary judgment with respect to the claims of gender discrimination. On November 20, 2012, the parties appeared for oral argument. For the reasons set forth herein, the court GRANTS-IN-PART Defendants' motion for summary judgment.

United States District Court
For the Northern District of California

## I. BACKGROUND[1]

Plaintiff Josephine Ortega ("Ortega"), a Hispanic female,[2] first joined the Physical Planning and Construction ("PP&C") unit at the University of California, Santa Cruz ("UCSC") as an assistant engineer in July 2001.[3] She was then promoted to Associate Architect in 2002, to Senior Architect in 2004, and to Supervising Senior Architect/Deputy Building Official in 2006.[4] Plaintiff Wenbo Yuan ("Yuan"), an Asian female,[5] joined PP&C as a Senior Architect in 2007.[6] Both Ortega and Yuan have extensive experience as project managers of various large-scale construction and planning projects.[7] PP&C has never appointed a female director in the technical areas, such as architectural services, engineering, and construction.[8]

PP&C utilizes a number of methods in promoting its employees. Campus Architect and Associate Vice Chancellor Frank Zwart ("Zwart") promoted Ortega several times without open recruitment or an interview process.[9] In 1999, PP&C held an open recruitment for the position of Principal Planner.[10] Zwart decided to split the position and chose two applicants to fill different roles: Charlie Eadie ("Eadie") became Director of Campus Planning and John Barnes ("Barnes")

---

[1] The court reviews the record in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[2] *See* Docket No. 49, Ex. 1.

[3] *See* Docket No. 61.

[4] *See* Docket No. 46 ¶ 2; Docket No. 56, Ex. 1 (Ortega Dep.) 59:22-60:25.

[5] *See* Docket No. 49, Ex. 1.

[6] *See* Docket No. 60.

[7] *See id.;* Docket No. 61.

[8] *See* Docket No. 60 ¶ 14.

[9] *See* Docket No. 46 ¶ 2.

[10] *See id.* at ¶ 3.

2

Case No.: 11-04031 PSG
ORDER GRANTING-IN-PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

became Principal Planner for Architectural Site Design.[11] When Eadie left the University in 2006, Zwart merged the roles and named Barnes as Director of Campus Planning, without an internal recruiting process.[12] When the Principal Architect position opened in 2008, PP&C conducted a search for the position.[13] Neither Ortega nor Yuan applied for the position.[14] The search was unsuccessful, however, and so Zwart again split the duties of the position and promoted Bret Caton ("Caton") to the Director of Architectural Services position, and Julian Halkett ("Halkett") to the Director of Construction position.[15] Zwart's stated reasons for the promotions were that Caton was the most senior architect and Halkett had the necessary construction and project management experience.[16]

In May 2010, Caton retired.[17] Barnes asked Bill Parro ("Parro") as to whether he could reclassify Felix Ang ("Ang"), a Senior Architect and Asian-American male, to that position.[18] Ang had joined UCSC in 2006.[19] Ang had done some architecture work in Singapore and the U.S., but did not obtain an architecture license until 2006.[20] Barnes thought Ang would be a good candidate because he was an "effective manager of his projects, willing to take on a lot of responsibility, and

---

[11] *See* Docket No. 46 ¶ 3.

[12] *See id.*

[13] *See* Docket No. 55 ¶ 2.

[14] *See id.* at ¶ 3.

[15] *See* Docket No. 46 ¶ 5; Docket No. 55 ¶ 5.

[16] *See id.*

[17] *See* Docket No. 53 ¶ 4.

[18] *Id.*; Docket No. 49, Ex. 1.

[19] *See* Ex. G (Ang Dep.) 9:9-13.

[20] *See* Docket No. 49, Ex. G (Ang Dep.) 10:6-21, 9:9-13.

was a highly respected team player."[21] Barnes also told several other managers that he was looking to reclassify Ang into the position without an open recruitment process.[22]

Parro told Barnes that "if there were other people in the department that were equally qualified," the department ought to "consider fairness" and use an "open recruitment or campus-only recruitment" to fill the position.[23] Under this directive, Barnes submitted a job posting for the vacant position on the campus employment website.[24] Barnes also chose a selection committee to evaluate the candidates, consisting of himself, his executive assistant Diane Lallemand ("Lallemand"), Robin Draper (Director of Capital Planning and Space Management and PP&C collaborator), Steve Houser (Director, Capital Planning, Colleges, Housing and Educational Services and frequent PP&C client), and Steve Paul (Campus Engineer of PP&C).[25] It is disputed as to why Lallemand was chosen to serve on the committee; Barnes himself admitted her primary role on the committee was to "keep track of the records… and what was going on," but she also scored the candidates and participated in the selection process.[26] Barnes also instructed executive assistant Lallemand to compile the scoring matrix using 19 of the 30 qualifications listed in the job description.[27] Plaintiffs contend each of the 11 qualifications omitted from the scoring criteria were technical skills.[28]

---

[21] Docket No. 53 ¶ 9; Docket No. 50 ¶ 5; Docket No. 51 ¶ 5; Docket No. 48 ¶ 5; Docket No. 52 ¶ 5.

[22] *See* Docket No. 59, Ex. H (Paul Dep.) 28:1-16.

[23] Docket No. 59, Ex. E (Parro Dep.) 47:3-16.

[24] *See* Docket No. 59, Ex. I (Barnes Dep.) 35:16-36:5.

[25] *See* Docket No. 53 ¶ 6.

[26] Docket No. 59, Ex. I (Barnes Dep.) 39:18-25; Docket No. 59, Ex. J (Lallemand Dep.) 16:11-24.

[27] *See* Docket No. 59, Ex. J (Lallemand Dep.) 36:6-25.

[28] *See* Docket No. 59, Ex. K.

United States District Court
For the Northern District of California

Five candidates applied for the position: Ortega, Yuan, Ang, Tom Rahe (a Caucasian male), and Halkett (a Caucasian male).[29] Barnes chose to interview all of the candidates except Halkett, because Barnes did not want to implement Halkett's proposal to combine two director positions.[30] Three of the candidates were interviewed on Wednesday, while Ang alone was interviewed the following Thursday.[31] After the interviews, the selection committee discussed each candidate and filled out scorecards evaluating the candidate within the 19 qualifications.[32] Within the discussion, Barnes and Paul apparently spoke about Yuan's friction with another manager, Halkett.[33] Barnes also spoke about a "heated interaction" between Paul and Yuan, where both argued in raised voices.[34] A few panelists also spoke negatively about Ortega.[35]

Each committee member ranked Ang as the highest scoring candidate. Ang scored 79.4, Rahe scored 65.4, Yuan scored 62.8, and Ortega scored 49. Collectively, the committee felt that Ang had given the best interview.[36] They felt that although "some of the other candidates had been licensed architects for longer, or had more project management experience," Ang had the advantages of "a strong collaborative approach, a team attitude, demonstrated problem solving

---

[29] *See* Docket No. 49, Ex. 1; Docket No. 53, ¶ 7.

[30] *See* Docket No. 53 ¶ 7; Docket No. 59, Ex. I (Barnes Dep.) 37:18-38:14.

[31] *See* Docket No. 59, Ex. H (Paul Dep.) 33:21-34:7, 34:24-35:6.

[32] *See* Docket No. 59, Ex. I (Barnes Dep.) 54:17,-55:9, 66:3-7, Docket No. 59, Ex J (Lallemand Dep.) 25:22-26:8; Docket No. 59, Ex. K.

[33] *See* Docket No. 59, Ex. I (Barnes Dep.) 55:10-56:4; Docket No. 59, Ex. H (Paul Dep.) 39:17-40:2.

[34] Docket No. 59, Ex. I (Barnes Dep.) 55:12-56:4.

[35] *See* Docket No. 59, Ex. M (Draper Dep.) 51:5-20, Docket No. 59, Ex. I (Barnes Dep.) 66:8-67:9.

[36] Docket No. 53 ¶ 9; Docket No. 50 ¶ 5; Docket No. 51 ¶ 5; Docket No. 48 ¶ 5; Docket No. 52 ¶ 5.

5

Case No.: 11-04031 PSG
ORDER GRANTING-IN-PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

skills, and an interest in setting goals and priorities for the Department."[37] As a result, Ang was promoted on August 12, 2010.[38]

On September 12, 2010, Ortega and Yuan each filed internal complaints with the University's Office of Diversity, Equity, and Inclusion.[39] They alleged gender discrimination and systemic gender discrimination against Barnes and Zwart in relation to the selection of Ang for Director of Architectural Services. Plaintiffs also alleged that Barnes unfairly "groomed" Ang for the position by giving him special assignments. Regents responded by retaining Deborah Allison, ("Allison"), an independent, outside investigator to survey Plaintiffs' complaints. Allison concluded that there was no discrimination.[40] She found that Ang was promoted for the non-discriminatory reasons stated by the selection committee: his "strong collaborative approach," "team attitude," "demonstrated problem solving skills," and an "interest in setting goals and priorities for the Department."[41]

**II. LEGAL STANDARD**

Summary judgment is appropriate only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[42] The moving party bears the initial burden of production by identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a triable issue of material fact.[43] If, as here, the moving party is

---

[37] Docket No. 53 ¶ 9; Docket No. 50 ¶ 5; Docket No. 51 ¶ 5; Docket No. 48 ¶ 5; Docket No. 52 ¶ 5.

[38] *See* Docket No. 53 at ¶ 9.

[39] *See* Docket No. 56, Ex. 1 (Ortega Dep.) 87:5-19, 186:16-22, 236:1-8; Docket No. 56, Ex. 2; Docket No. 56, Ex. 4 (Allison Dep.) 12:13-21.

[40] *See* Docket No. 56, Ex. 4 (Allison Dep.) 7:8-12; Docket No. 56, Ex. 5.

[41] Docket No. 56, Ex. 5.

[42] Fed. R. Civ. P. 56(a).

[43] *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

United States District Court
For the Northern District of California

the defendant, he may do so in two ways: by proffering "affirmative evidence negating an element of the non-moving party's claim," or by showing the non-moving party has insufficient evidence to establish an "essential element of the non-moving party's claim."[44] If met by the moving party, the burden of production then shifts to the non-moving party, who must then provide specific facts showing a genuine issue of material fact for trial.[45] The ultimate burden of persuasion, however, remains on the moving party.[46] In reviewing the record, the court must construe the evidence and the inferences to be drawn from the underlying evidence in the light most favorable to the non-moving party.[47]

## III. DISCUSSION

### A. Timeliness of Plaintiffs' Claims

#### 1. Acts Occurring Prior to April 4, 2010 are Untimely for Purposes of FEHA

Regents argue that any events occurring before April 4, 2010 cannot form the basis of Plaintiffs' claims because they are untimely. Before filing a civil action for damages under FEHA, the plaintiff must first timely file an administrative complaint with the Department of Fair Employment and Housing ("DFEH"). Under FEHA, the complaint must be filed with the DFEH no later than "the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred."[48] Thus, the civil suit is limited to the subject matter that was timely in the DFEH administrative action – namely, the events that occurred up to one year before the DFEH complaint was filed.

---

[44] *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).

[45] *See id.* at 330; *T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 630, 630 (9th Cir. 1987).

[46] *Id.*

[47] *See Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[48] Gov. Code § 12960; *See also Romano v. Rockwell Internat., Inc.* 14 Cal. 4th 479, 492 (1996).

United States District Court
For the Northern District of California

Plaintiffs filed the DFEH complaint on the facts alleged in this suit on April 4, 2011, limiting the subject matter to the events occurring on or after April 4, 2010. Under California law, however, a defendant may be held liable for conduct that precedes the timeframe provided by FEHA if the conduct is deemed to be part of a continuing violation. Separate acts may be considered to be part of a continuing violation if the acts are (1) "sufficiently similar in kind", (2) "have occurred with reasonable frequency", and (3) "have not acquired a degree of permanence."[49]

The Plaintiffs assert that the promotions and reclassifications at issue form a continuing violation.[50] It is well-established that in general, promotions are discrete acts rather than part of a continuing course of conduct.[51] Here, Plaintiffs have not shown circumstances that would be an exception to the general rule. If, for example, they had alleged they were eligible for each of the promotions in question and were repeatedly passed over with assurances they would be promoted later, their delay in bringing the claim might be justified.[52] However, Plaintiffs were not even employed when some of the decisions took place. They merely claim there was a "policy" of "providing supervisors with complete discretion in terms of who to promote," but this does not sufficiently tie the promotions together.[53] But the promotions they point to are not sufficiently similar; they were made by different decisionmakers, in different circumstances, over the course of over twelve years.[54] It is not enough that the promotions in question were all allegedly motivated by race or gender; if so, "the continuing violation doctrine would apply in almost every case."[55]

---

[49] *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 823, 29 P.3d 175 (2001)

[50] *See* Docket No. 62 at 13-15.

[51] *See Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 112-113 (2002).

[52] *See, e.g., Hilliard v. Qualcomm Inc.*, D043066, 2004 WL 2378399 (Cal. Ct. App. Oct. 25, 2004)

[53] Docket No. 62 at 14.

[54] *See* Docket No. 56, Ex. 11.

[55] *Carter v. City & County of San Francisco*, 1996 WL 346887 (N.D. Cal. June 19, 1996).

United States District Court
For the Northern District of California

Without sufficient similarities tying the acts together, the promotions were discrete employment acts, not parts of a continuing violation.

**2. Acts Occurring Prior to June 15, 2010 Are Untimely for Purposes of Title VII**

A charge filed under Title VII must be filed within 300 days after the allegedly unlawful employment practice, or 30 days after notice that the state agency has terminated its proceedings under state law, whichever is earlier.[56] Plaintiffs filed their EEOC charges on April 11, 2011. Accordingly, only acts occurring on or after June 15, 2010 (300 days prior) are timely under Title VII.

Again, Plaintiffs may not extend their claims to acts occurring outside of the statutory time period because the continuing violation doctrine does not apply. The Supreme Court has stated that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."[57] Discrete discriminatory acts include acts such as "termination, failure to promote, denial of transfer, or refusal to hire."[58] The promotions and reclassifications that Plaintiffs seek to include clearly fall into this category.

To the extent that the plaintiffs intend to base their claims on acts occurring before June 15, 2010 (Title VII) and April 4, 2010 (FEHA), those claims are untimely. From Regents' briefing, it appears only Ang's promotion is in contention and timely under both FEHA and Title VII.[59] Plaintiffs do not dispute this claim.

This is not to say that Plaintiffs may not refer to these incidents as supporting evidence; the statute of limitations does not "bar an employee from using the prior acts as background evidence

---

[56] 42 U.S.C. § 2000e-5(e)(1)

[57] *AMTRAK v. Morgan*, 536 U.S. 101, 113-14 (2002).

[58] *Id.*

[59] *See* Docket No. 44 at 15.

in support of a timely claim."[60] Regents is mistaken in suggesting that the court must ignore any events that occurred outside of the statutory period.[61]

**B. Gender Discrimination**

The court now turns to that Regents' promotion of Ang constituted gender discrimination. Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[62] FEHA similarly prohibits employment discrimination based on sex.[63]

In *McDonnell Douglas Corp. v. Green*, the United States Supreme Court provided the framework for establishing discrimination through circumstantial evidence.[64] First, the plaintiff must make a prima facie case for gender discrimination.[65] If the plaintiff succeeds, the burden of production then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection."[66] The plaintiff must then show that the legitimate reasons provided by the employer were not true reasons, but were merely a pretext for discrimination.[67] "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is

---

[60] *Morgan*, 536 U.S. at 102.

[61] *See, e.g.*, Docket No. 67 at 14.

[62] 42 U.S.C. § 2000e–2(a)(1).

[63] "It is an unlawful employment practice… (a) For an employer, because of the… sex, gender… of any person to refuse to… discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code § 12940.

[64] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). California state courts have also adopted the *McDonnell Douglas* framework for trying employment discrimination claims under FEHA. *See Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000).

[65] *See McDonnell Douglas*, 411 U.S. at 802.

[66] *Id.*

[67] *Id.* at 804.

accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."[68]

**1. Plaintiffs' Prima Facie Case**

In *McDonnell Douglas*, the Supreme Court provided a set of four requirements for the plaintiff to show a prima facie case.[69] The test was "designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified."[70]

The prima facie elements named in McDonnell Douglas. The prima facie case is not a rigid test; the elements may vary depending on the facts and circumstances of the case.[71] The parties agree here that to present a prima facie case, the plaintiff must show (i) that she belonged to a protected class, (ii) they were performing according to the employer's legitimate expectations, (iii) they suffered an adverse employment action, and (iv) some other circumstance exists that suggests a discriminatory motive, such as being treated less favorably than other similarly-situated employees outside of the protected class.[72]

A plaintiff's burden of establishing a prima facie case is not onerous.[73] Plaintiffs have established that they can meet the first three elements of the prima facie case. Regents only dispute whether Plaintiffs can show some circumstance suggesting a discriminatory motive.

To satisfy the fourth element in a "failure-to-promote" case, the Ninth Circuit has held that the plaintiff need only present "sufficient evidence from which the trier of fact could reasonably

---

[68] *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (citation omitted).

[69] *See McDonnell Douglas*, 411 U.S. at 804.

[70] *Guz*, 24 Cal. 4th at 354-55.

[71] *Id.* (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, fn. 6 (1981)).

[72] *See id.* at 355; *See also McDonnell Douglas*, 411 U.S. at 804.

[73] *See Burdine*, 450 U.S. at 253.

infer that they possessed the 'minimum qualifications' for the positions, or that their qualifications were comparable with those of the persons awarded the positions." [74]

Plaintiffs have provided ample evidence raising a triable issue of fact that they were at least as qualified, if not more qualified, than the man who received the promotion. At the time of Ang's promotion, each of the plaintiffs had extensive experience managing projects and had held architectural licenses for several years. Yuan had been a licensed architect for nine years and had worked on several multi-million dollar projects, including the Biomedical Sciences Facility project, which was the "largest and most complex single project" undertaken by UCSC.[75] Ortega had held an architecture license for about fifteen years and had served as project manager for several large-scale projects.[76] Ang had managed only one project before coming to UCSC in 2006 and had only held an architectural license for four years.[77] Members of the selection panel even admitted Ang did not have the same technical qualifications as some other candidates.[78] This evidence is sufficient to raise a triable issue of fact as to whether the plaintiffs were at least as qualified, if not more so, than the chosen candidate for promotion. The court need not actually decide whether plaintiffs were indeed more qualified; that is a factual question to be determined by the jury.[79]

**2. Regents' Legitimate, Nondiscriminatory Reason**

Regents' must then provide a legitimate, nondiscriminatory reason for the employment action. A defendant must produce admissible evidence showing legitimate, nondiscriminatory

---

[74] *Lyons v. England*, 307 F.3d 1092, 1113-14 (9th Cir. 2002) (internal citations omitted).

[75] Docket No. 60.

[76] *See* Docket No. 61.

[77] *See* Docket No. 59, Ex. G (Ang. Dep.) 10:6-21, 9:9-13.

[78] *See* Docket No. 53 ¶ 9; Docket No. 50 ¶ 5; Docket No. 51 ¶ 5; Docket No. 48 ¶ 5; Docket No. 52 ¶ 5.

[79] *See Lyons*, 307 F.2d at 1117.

**United States District Court**
For the Northern District of California

reasons, which, if believed by the trier of fact, would support a finding that its actions were not motivated by unlawful discrimination.[80] The evidence may provide reasons for plaintiff's rejection, or why someone else was preferred.[81] Regents' selection committee offered that they chose Ang primarily because he had "a strong collaborative approach, a team attitude, demonstrated problem solving skills, and an interest in setting goals and priorities for the Department."[82] The Ninth Circuit has held that good interpersonal and communication skills may be valid, nondiscriminatory reasons for hiring or promotion.[83] In doing so, Regents has satisfied their burden of production by pointing to a legitimate, nondiscriminatory reason for promoting Ang.

**3. Plaintiff's Proof of Pretext**

Confronted with Regents' legitimate, nondiscriminatory reason for promoting Ang, Plaintiffs must then show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."[84] Pretext may be proved by demonstrating that the employer's proffered reasons are "unworthy of credence," or false or obviously contrived.[85] "[T]he employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence ... and hence infer that the

---

[80] *See Burdine*, 450 U.S. at 254-55.

[81] *See id.*

[82] Docket No. 53 ¶ 9; Docket No. 50 ¶ 5; Docket No. 51 ¶ 5; Docket No. 48 ¶ 5; Docket No. 52 ¶ 5.

[83] *See also Hutcherson v. Miles Biologicals*, Case No. C-97-0433 MHP, 1998 WL 30011 (N.D. Cal. Jan. 5, 1998) (holding "strong leadership abilities, including the ability to respect and cooperate with his superiors and co-workers," was a legitimate nondiscriminatory reason for promotion).

[84] *Reeves*, 530 U.S. at 143.

[85] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514 (1993); *See also Reeves*, 530 U.S. at 147.

United States District Court
For the Northern District of California

employer did not act for the ... non-discriminatory reasons."[86] Alternatively, Plaintiffs may also prove pretext by showing discrimination more likely motivated the employer.[87] Further, in scrutinizing the issue of pretext, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom."[88]

Plaintiffs argue that women applicants for director positions were held to a higher standard of interpersonal skills, which is evidence of pretext. "A showing that… similarly situated employees outside [the plaintiff's] protected class were treated more favorably would be probative of pretext."[89] Plaintiffs argue Barnes interpreted a "heated interaction" between Yuan and Paul as an indication that Yuan did not have the interpersonal skills to be a good manager, despite the fact that Barnes did not know the details of the confrontation.[90] Plaintiffs allege that while Barnes considered this confrontation to be evidence that Yuan was not fit to be a director, Barnes still considered Paul, the male manager involved in the dispute, to be a good manager.[91] Whatever the jury's ultimate conclusion, plaintiffs have created a triable issue of fact of the employer's unequal treatment of male and female managers or managerial candidates.

Additionally, Plaintiffs point to substantial evidence in the record suggesting Regents' stated reasons for hiring Ang are inconsistent with traditional promotional criteria.[92] Plaintiffs may

---

[86] *Dep't of Fair Employment & Hous. v. Lucent Technologies, Inc.*, 642 F.3d 728, 746 (9th Cir. 2011)

[87] *See Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000)

[88] *Burdine*, 450 U.S. at 255, fn. 10; *See also Reeves*, 530 U.S. at 143.

[89] *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003); *See also McDonnell Douglas*, 411 U.S. at 804.

[90] Docket No. 59, Ex. I (Barnes Dep.) 54:17-55:9; 55:12-56:4.

[91] *Id.* at 55:12-56:4.

[92] As explained above, though acts outside of the statutory period may not serve as the basis of Plaintiffs' claims of gender discrimination, they may be considered "as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 102.

14

Case No.: 11-04031 PSG
ORDER GRANTING-IN-PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

prove pretext by showing the employer's reasons are "internally inconsistent or otherwise not believable."[93] Previous managerial promotions within PP&C were based on technical knowledge and experience. For example, Regents alleged Caton's promotion in 2006 to Director of Architectural Services was because Caton was the "most senior architect in the department at the time."[94] Regents promoted Halkett to Director of Construction Services because he had "significant construction experience and significant skills in project management."[95] Regents promoted Dean Fitch to the Director of Planning position because he was the only person within the department who had the required technical experience.[96] In contrast, Regents alleges Ang's promotion was based on his interpersonal and management skills, or as Regents put it, his "strong collaborative approach, a team attitude, demonstrated problem solving skills, and an interest in setting goals and priorities for the Department."[97] Plaintiffs argue this inconsistency suggests Regents' proffered reason for hiring Ang was fabricated.

The court agrees with Plaintiffs. A sudden shift in promotional criteria, combined with some direct evidence of animus, may cast doubt on the validity of Regents' decision. This creates a triable issue of fact on the material issue of pretext. Because a reasonable jury might infer discrimination based on the evidence presented, summary judgment on Plaintiffs' gender discrimination claim regarding Ang's promotion would be improper.

---

[93] *Chuang*, 225 F.3d at 1127.

[94] *See* Docket No. 46 ¶ 5.

[95] *See id.*

[96] *See* Docket No. 53 ¶ 3.

[97] *Id.* at ¶ 9; Docket No. 50 ¶ 5; Docket No. 51 ¶ 5; Docket No. 48 ¶ 5; Docket No. 52 ¶ 5.

**C. Race Discrimination**

Regents assert that Plaintiffs' racial discrimination claim regarding Ang's promotion is untenable because the only evidence offered by Plaintiffs is the fact that Ang is Asian-American. Through the court's review of the record provided by the parties, this assertion appears to be accurate. Plaintiffs have not opposed Regents' motion for summary judgment on their racial discrimination claim; they have not proffered any evidence to the contrary. First, both Ang and one of the plaintiffs, Yuan, are Chinese-American, making discrimination unlikely. Next, though Ortega is of a different race than Ang, the bare assertion that the plaintiff was of a different race than the chosen candidate does not support a reasonable inference that the employer had a discriminatory motive in making the employment decision.[98] Thus, Regents are entitled to summary judgment on Plaintiffs' race discrimination claim.

## IV. CONCLUSION

Regents' Motion for Summary Judgment regarding FEHA claims occurring before April 4, 2010 and Title VII claims occurring before June 15, 2010 is GRANTED. Regents' Motion for Summary Judgment regarding Plaintiffs' race discrimination claims is GRANTED. Regents' Motion for Summary Judgment on Plaintiffs' gender discrimination claims is DENIED.

IT IS SO ORDERED.

Dated: November 29, 2012

PAUL S. GREWAL
United States Magistrate Judge

[98] *See, e.g., Ramirez v. County of Marin*, 2011 WL 1522347 (N.D. Cal. Oct. 25, 2011); *Simpson v. Borg-Warner Auto. Inc.*, 196 F.3d 873, 878 (7th Cir. 1999).